**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SIGN PRO, INC., PRO REALTY LLC, and<br>PETER RAPPOCCIO, | : | No. 3:23-cv-00651 |
| | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| TOWN OF SOUTHINGTON, | : | |
| JEFFREY POOLER, MARK SCIOTA, | : | |
| VICTORIA TRIANO, ALEX RICCIARDONE, | : | |
| and PAUL CHAPLINSKY, | : | |
| | : | |
| Defendants. | : | JUNE 26, 2025 |

## THIRD AMENDED COMPLAINT

1.     This case is about a municipality's obligation to enforce its own laws and state laws evenhandedly and treat its citizens and its local businesses fairly.

2.     In 1990, Peter Rappoccio started Sign Pro, Inc. ("Sign Pro") as a small sign-making business serving Connecticut.  It has since grown into one of the largest and most successful sign companies in New England.

3.     Although Sign Pro does business all over the State of Connecticut, it has a substantial presence in Southington. In 2014, Sign Pro opened a state of the art retail and manufacturing facility in Southington.  Given its presence in the area, Sign Pro does a substantial volume of business in Southington and provides signs to local businesses.

4.     Sign Pro prides itself on complying with all applicable state and local regulations governing the construction, design, and installation of signs.  This includes obtaining all necessary licenses and permits for every job that Sign Pro undertakes and communicating to customers what can and cannot be done consistent with local regulations.

5.    Like many municipalities, Southington has specific permitting and zoning requirements for the installation of new signs and the replacement or refacing of old signs for local businesses.  Sign Pro follows these requirements, but many of its competitors do not.

6.    Indeed, many sign companies operating in Southington do so without the necessary permits and licenses.  This allows these companies to charge less for their services, putting Sign Pro at a competitive disadvantage.

7.    Sign Pro reported its concerns to the Town of Southington.  Sign Pro identified numerous instances—many in real time as the signs were being installed—where sign companies were operating without any licenses or permits.

8.    In connection with these reports, Sign Pro simply asked that the Town of Southington enforce its own rules.  Companies that are illegally operating should be, among other things, reported to the Department of Consumer Protection and signs that were installed without licenses or permits should be removed.

9.    Instead of enforcing the rules, the Town of Southington allowed companies illegally installing signs to continue operating with impunity.  To make matters worse, the Town of Southington and its public officials have engaged in a pattern of harassment targeting Sign Pro in retaliation for Sign Pro simply asking that the Town of Southington evenhandedly apply its own rules and regulations.

10.    In the process, the Town of Southington and its public officials have violated Plaintiffs' constitutional rights to due process and equal protection.  Plaintiffs bring this action to vindicate its rights and bring to light the disturbing pattern of behavior it has been subjected to as a business operating in the Town of Southington.

## PARTIES

11.    Plaintiff Sign Pro, Inc. is a Connecticut corporation with a business address of 60 Westfield Drive, Plantsville, Connecticut, 06479.  Plantsville is a neighborhood within the Town of Southington.

12.    Plaintiff Pro Realty LLC is a Connecticut limited liability corporation with a business address of 60 Westfield Drive, Plantsville, Connecticut, 06479.  Pro Realty is the owner of real property located at 161 Canal Street, Plantsville, Connecticut 06479.

13.    Plaintiff Peter Rappoccio is the President of Sign Pro.

14.    Defendant the Town of Southington is a municipal corporation chartered pursuant to the laws of the State of Connecticut with a mailing address of 75 Main Street, Southington, Connecticut 06489.

15.    Defendant Jeffrey Pooler is the former Chief Building Official for the Town of Southington.

16.    Defendant Mark Sciota is the former Town Manager for the Town of Southington.

17.    Defendant Victoria Triano is the former Chairwoman of the Southington Town Council.

18.    Defendant Alex Ricciardone is the current Town Manager for the Town of Southington and former Town Attorney for the Town of Southington.

19.    Defendant Paul Chaplinsky is the current Chairman of the Southington Town Council.

## BACKGROUND

**A. Defendants Refuse to Evenhandedly Enforce Existing Rules and Regulations Regarding Sign Installations, Placing Sign Pro At A Competitive Disadvantage**

20.     As noted, sign installations performed in the Town of Southington are subject to state and local rules and regulations.

21.     This includes the Town of Southington's Sign Installation Policy, which was issued in January 2021 and signed by Pooler and Sciota. According to the Sign Installation Policy, all new signs, sign replacements, and sign refacings require zoning permits from the Planning & Zoning Department and a building permit from the Building Department. Permit applicants must inform the Building Department of the installation date and time prior to issuance of the permit.

22.     There are also strict licensing requirements for work done in connection with the installation of any sign that requires electrical wiring or is capable of being connected to existing electrical terminals. The on-site installer must have the appropriate license and have it available at the job site at all times, as required by the Connecticut Department of Consumer Protection.

23.     That said, other sign installers in the Town of Southington do not comply with— and indeed openly disobey—these regulations. They install signs without permits and without licenses and falsely tell business owners that they can do the job for less money because the permits and licenses are not required.

24.     This puts Sign Pro at a competitive disadvantage. Sign Pro advises potential clients that it will need to comply with local rules and regulations, even if this means additional time and cost to the project.

25.     In 2019 and during discussions regarding the volume of unaddressed sign violations in the Town of Southington, Sciota and Planning and Zoning Elected Official Mike Del Santo

requested that Sign Pro and Mr. Rappoccio report these violations to the Town of Southington. Sign Pro and Mr. Rappoccio therefore began reporting violations to Defendants.

26.     Between 2019 and 2022, Sign Pro and Mr. Rappoccio reported countless instances of violations where signs that were installed without permits and licenses. In some cases, Plaintiffs caught these companies in the act and provided photographs and video evidence to, among others, Sciota, Triano, Ricciardone, Chaplinsky, and members of the Town Council.

27.     In response to these complaints, Sciota and Ricciardone claimed that the Town of Southington would investigate and follow up. Years later, many of these reports have never been addressed.

28.     In reality, the Town of Southington did not handle these violations in the manner required by existing building codes and they have allowed these violations to continue without consequence. Even in the event a notice of violation was ever issued, the violation was issued to the building owner, not the company or individuals installing the sign. And the company or individuals installing the sign were not reported to the Connecticut Department of Consumer Protection for further action.

29.     The Town of Southington would also not require or direct the removal of illegally installed signs. Illegally installed signs, however, pose a threat to public safety because there is no way of knowing who installed the signs, if the signs were manufactured pursuant to approved standards, and if the signs were installed properly.

30.     The Town of Southington also failed to report the companies that were operating illegally in the Town of Southington to the Connecticut Department of Consumer Protection. In many cases, the Town of Southington would not even make an effort to ascertain the identity of the companies installing illegal signs.

31. At the same time that the Town of Southington, Sciota, and Triano have deliberately allowed Sign Pro's competitors to illegally install signs without consequences, Sign Pro has been singled out for unfair treatment and harassment meant to harm Sign Pro's business.

32. Upon information and belief, Pooler, Sciota, and Triano are retaliating against Sign Pro for reporting other violators and exposing their incompetence.

**B. Defendants Delayed and Interfered With the 161 Canal Street Project**

33. As part of Defendants' deliberate pattern of harassment and unequal treatment of Sign Pro, Defendants unreasonably and without justification delayed and interfered with a significant expansion project that Sign Pro undertook in October 2020.

34. Given Sign Pro's massive growth as a business, it needed additional space beyond its existing retail and production facility in the Town of Southington.

35. In 2020, Sign Pro purchased a parcel of property located at 161 Canal Street, which was conveniently located near Sign Pro's production facility.

36. Sign Pro planned to build an annex building for storage of material and equipment at 161 Canal Street.

37. Sciota represented to Plaintiffs and the Town of Southington's Economic Development Strike Committee that the approvals needed for construction at 161 Canal Street would be expedited.

38. Sciota's representation proved to be false. Plaintiffs encountered numerous delays related to the permitting and construction of the annex building at 161 Canal Street.

39. In October 2020, Sign Pro submitted plans to the Town of Southington for the construction of the annex building at 161 Canal Street.

40.    The Building Department initially claimed that extensive soil testing would be required before the work could move forward because the property was located on a wetland.

41.    As the Building Department later acknowledged, they were relying on an incorrect GIS map and the soil testing was not required.  This caused substantial delays in the initial processing Plaintiffs' plans.

42.    On or around November 16, 2020, Plaintiffs submitted a Building Permit Application for 161 Canal Street for the construction of a 15,000 square foot equipment storage facility.  Plaintiffs paid $7,908.70 in fees in connection with the Building Permit Application. These fees were paid under protest, as the fees should have been waived based on state grant money that was awarded for a tax abatement for Sign Pro that the Economic Development Strike Committee (of which Sciota was a member) unanimously approved.

43.    On or about November 19, 2020, the Town of Southington's Fire Marshal's Office reviewed the plans for 161 Canal Street and found them to be in substantial compliance with code requirements.

44.    On or around December 14, 2020, the Office of the Building Department completed a plan review for 161 Canal Street and noted that there would be "[n]o parking of commercial motor vehicles" based on International Building Code ("IBC") Section 903.2.10.1.  This provision states that an automatic sprinkler system shall be provided in buildings used for storage of commercial motor vehicles where the fire area exceeds 5,000 square feet.

45.    On December 30, 2020, the Planning and Zoning Department approved the Zoning Permit for 161 Canal Street.

46.    On or about January 4, 2021, the Town of Southington issued Building Permit No. TB-20-75376 (the "Building Permit") for "construction of new 15,000 s.f. low hazard equipment

storage facility." Pooler signed Building Permit No. TB-20-75376 as Building Official for the Town of Southington. The Building Permit noted "NO STORAGE OF COMMERCIAL MOTOR VEHICLES ALLOWED PER IBC SECTION 903.2.10.1" and "Use and Occupancy: S-2." Storage Group S-2 occupancies include buildings used for the storage of noncombustible materials.

47.    A document listing the code summary requirements for the Building Permit stated that a sprinkler system was not required. This same document cited IBC Section 903.2.10.1, which again only requires a sprinkler system for buildings used for storage of commercial motor vehicles where the fire area exceeds 5,000 square feet.

48.    Plaintiffs' intent was to use 161 Canal Street for equipment storage.

49.    After the inexplicable delays with the issuance of the building permit, Plaintiffs were finally able to begin construction of the annex building at 161 Canal Street in January 2021. By August 2021, construction was substantially complete.

50.    On or about August 17, 2021 the Southington Fire Department completed its final inspection, approved 161 Canal Street for "S-2 low-hazard occupancy," and recommended that the Certificate of Occupancy be granted.

51.    On or about August 18, 2021, Pooler conducted an inspection of 161 Canal Street and demanded, for the first time, that Plaintiffs install at significant cost an automatic sprinkler system inside the annex building.

52.    Pooler claimed that a sprinkler system was required in order for Plaintiffs to store vehicles inside the annex building.

53.    Plaintiffs had understood and relied upon the fact that, based on the Building Permit, an automatic sprinkler system was not required.

54.    Pooler nonetheless claimed without basis that Plaintiffs could not store any vehicles—regardless of classification or weight—at 161 Canal Street.

55.    Following the August 18, 2021 inspection, Pooler also noted other changes that Plaintiffs would have to make before receiving a Certificate of Occupancy.  Pooler "discovered" some of these additional changes after the inspection based on his supposed research of the building codes.

56.    Overall, Pooler demanded numerous deviations from the approved plans for 161 Canal Street, causing Plaintiffs to incur hundreds of thousands of dollars in additional costs.  As a result of Pooler's conduct, Plaintiffs incurred additional costs related to, among other things, relocation of the air conditioning units, modifications to gas piping, modifications to the bathrooms, modifications to the water fountains, adding railings, modifications to existing signage, and, most troublingly, the addition of the sprinkler system.

57.    The Town of Southington also demanded that Plaintiffs install a curb at 161 Canal Street that was not required by the approved plans.  This further delayed Plaintiffs' use of the building and was yet another unnecessary cost that Plaintiffs had to incur, as the Town of Southington ultimately elected to remove the curb because it caused water to pool on the roadway.

58.    Upon information and belief, the changes and deviations that Pooler and the Town of Southington demanded, including the sprinkler system, were a pretext intended to harass and oppress Plaintiffs.

59.    On or about August 26, 2021, Pooler issued a Temporary Certificate of Occupancy for 161 Canal Street providing that there would be no storage of any motor vehicles in the building until the sprinkler system was installed and approved.  Pooler gave Plaintiffs until September 27,

2021 to complete this and other modifications—all of which can and should have been noted months earlier.

60.    Because time was of the essence, Sign Pro proceeded with the installation of a costly and unnecessary automatic sprinkler system.  Sign Pro needed the use the annex building immediately and any further delays would have had a significant financial impact on its business. For example, Sign Pro had a multimillion dollar upcoming job, the materials for which were being delivered soon and for which Sign Pro needed the storage space.

61.    After Sign Pro completed the installation of the sprinkler system, it had to contact Pooler numerous times to request an inspection.  Pooler claimed an inspection was not required for the sprinkler system.  This was incorrect and, in reality, would have just provided Pooler with an open-ended reason to continue to harass Plaintiffs with regard to this property.

62.    On or about September 27, 2021, Pooler issued another Temporary Certificate of Occupancy for 161 Canal Street.  The Certificate of Occupancy again stated that there would be no storage of *any* motor vehicles in the building until the sprinkler system was installed and approved.

63.    Finally, on December 28, 2021, Pooler issued a Certificate of Occupancy for 161 Canal Street.  The Certificate of Occupancy noted that there was a "change of use"—although Plaintiffs had never requested a change of use—to allow commercial vehicle storage in areas exceeding 5,000 square feet.

64.    Again, Plaintiffs intended to store equipment at 161 Canal Street, not commercial vehicles.  Upon information and belief, Pooler's insistence that Plaintiffs install a costly sprinkler system was a pretext intended to harass and oppress Plaintiffs.

65. And even if Pooler were correct that a sprinkler system was required (he was not), this issue should have been raised months earlier by the Planning and Zoning Department, when the construction drawings for 161 Canal Street were reviewed, or when the Fire Marshal's Office reviewed the plans. As noted, the Town of Southington's Fire Marshal's Office reviewed the plans for 161 Canal Street in November 2020—almost a year before Pooler's inspection—and found them to be in substantial compliance with code requirements.

66. Plaintiffs notified Sciota, Triano, and Ricciardone on numerous occasions regarding the delays and issues related to 161 Canal Street.

67. Defendants' unreasonable and oppressive conduct with respect to 161 Canal Street caused Plaintiffs to suffer substantial delay and monetary damages, including the costs of making unnecessary modifications to the annex building in order to obtain a Certificate of Occupancy.

## C. Defendants Delayed and Interfered With Sign Pro's Work in the Town of Southington

68. As part of Defendants' deliberate pattern of harassment and unequal treatment of Sign Pro, Defendants unreasonably and without justification delayed and interfered with numerous Sign Pro projects throughout the Town of Southington.

69. This pattern of harassment and unequal treatment took several forms. Sign Pro's permit applications were inexplicably delayed or denied for pretextual reasons. Other building permits might be approved in three days while Sign Pro's permits would not be approved for 30 days.

70. Sciota also falsely accused Sign Pro of installing non-permitted signs.

71. Upon information and belief, officials at the Building Department and Planning and Zoning Department would deliberately ignore calls from Sign Pro's offices. When Sign Pro employees would call from an office phone, there would be no answer. But as soon as they called

from a personal phone so that the Building Department and Planning and Zoning Departments would not know who was calling, the call would be answered.

72.     Pooler would also often contact Sign Pro's clients directly to report issues and violations.  This was intended to harm Sign Pro's business and undermine the confidence of its clients in Sign Pro's compliance with local regulations.

73.     Representative examples of Pooler's conduct are alleged below.

*1 North Main Street*

74.     In January 2022, Sign Pro applied with the Planning and Zoning Department for a permit to replace a sign face on an existing cabinet at 1 North Main Street, Southington, Connecticut for a new local business, Apple Valley Pharmacy.

75.     On or about January 31, 2022, the permit was denied, purportedly because the sign was illuminated.  In a letter signed by Assistant Town Planner David Lavallee, the Planning and Zoning Department claimed that "[p]er Section 130-07.D of the Zoning Regulations, internally illuminated signage of any kind is prohibited in the CB zone."

76.     This was incorrect.  There are numerous signs in this zoning district—including the very sign face that Sign Pro was asking for permission to replace—that were illuminated.

77.     Sign Pro's client had been informed that the Certificate of Occupancy for his business was being held up pending approval of the zoning permit for the sign.

78.     Upon information and belief, the claimed reason for denying Sign Pro's zoning permit was pretextual.

79.     When confronted with the facts, Ricciardone claimed that the sign face for 1 North Main Street had been disconnected from the electrical hookup because the previous tenant, Subway, did not have a permit for an illuminated sign.

80.     This too was incorrect.  For one, there was no record of a permit being applied for or granted for disconnecting the electrical hookup for this tenant.  And as Sign Pro would later confirm, the existing sign cabinet was still hooked up to electricity and had never been disconnected.

81.     After several months of unexplained delays, the zoning permit for 1 North Main Street was finally approved in May 2022.

82.     Sign Pro then applied for a building permit that was likewise subject to unexplained delays and interference from Pooler.

83.     In May 2022, Pooler conducted an inspection at 1 North Main Street.  Pooler did not contact Sign Pro in advance of his arrival on-site and Sign Pro had to learn from its client that the inspection was happening at that specific time.  During the inspection, Pooler claimed that the building permit could not be approved because the sign cabinet did not have a timer or a disconnect switch at the circuit breaker.  Pooler told the client that Sign Pro would have to fix these issues and apply for separate permits to do so.

84.     Upon information and belief, the purported grounds for refusing to approve the building permit were pretextual.  Pooler admitted that he did not perform any visual inspection of the relevant electrical equipment.

85.     In June 2022, Pooler finally approved the building permit after Sign Pro provided Pooler with specific building code references proving that he had no basis to withhold the permit. Upon information and belief, Pooler then "backdated" his approval of the permit to May 2022 to cover up his mistake.

*1 Center Street*

86.     In May 2022, Ricciardone requested that Plaintiffs install a sign in the Town of Southington *without* applying first for a permit in order to see how Defendants would respond.

87.     Relying on this request, Sign Pro installed a new sign for a tenant, M&T Bank, at 1 Center Street, Southington, Connecticut.

88.     On or about May 19, 2022, Sign Pro met with Sciota to discuss its ongoing concerns about proper enforcement of rules and regulations regarding sign installations in the Town of Southington.  Upon information and belief, Ricciardone told Pooler after this meeting to stop singling out Sign Pro for unfair treatment.

89.     The very next day, Pooler issued a Notice of Violation to the property owner at 1 Center Street.  The violations alleged in the Notice of Violation were frivolous and incorrect.  The Notice of Violation indicated that a copy was sent to Town Attorney Ricciardone, but Town Attorney Ricciardone never received a copy.

90.     In June 2022, the Planning & Zoning Department approved Sign Pro's application for a zoning permit to replace the sign for M&T Bank at 1 Center Street.

91.     On June 10, 2022, Pooler approved a building permit to replace the same sign at M&T Bank.

92.     Following completion of the work, Pooler conducted an inspection on or about September 26, 2022.

93.     Sign Pro installed over 150 new M&T Bank signs all around Connecticut as part of M&T Bank's acquisition of People's United Bank.  All except for the 1 Center Street passed inspections from local building officials.

94.    Pooler claimed that the inspection failed because Sign Pro refused his request to use its ladder to access the sign.

95.    Sign Pro never denied Pooler access to the installed sign.  But Sign Pro reasonably denied Pooler's demand to use its ladder because this presented an obvious liability issue for Sign Pro.

96.    Sign Pro was specifically advised by its insurance carrier following the inspection that no third parties should be permitted to use Sign Pro's equipment and ladders.

97.    Upon information and belief, Pooler's stated reason for failing the inspection was a pretext.

98.    Sign Pro later submitted aerial photographs of the installed sign to Pooler, as it was specifically advised to do by Ricciardone.

99.    Pooler then unreasonably and without justification delayed completion of his inspection.  Pooler did not issue the Certificate of Approval for 1 Center Street until on or about November 15, 2022.

100.    Moreover, the Notice of Violation is still listed on the records for 1 Center Street, which presents an ongoing issue for the building's owner.  Sign Pro has repeatedly requested that Defendants remove this Notice of Violation, but they have refused to do so.

### 685 Queen Street

101.    In June 2022,  Sign Pro submitted permit applications to replace signs and awnings for all of the tenants at 685 Queen Street, Southington, Connecticut.

102.    Before submitting this application, Sign Pro removed the existing awnings on the building in preparation for its work.  This work did not require a permit.

103.   Pooler thereafter issued a cease and desist order to the property owner, claiming that a building permit was required to remove the awnings.

104.   Plaintiffs requested information about past permits that had been issued for removing awnings.  Pooler had no response.

105.   Sign Pro's permit applications for 685 Queen Street were subject to months of unexplained delays by the Planning and Zoning Department and Building Department.

106.   At one point, Pooler demanded that Sign Pro produce detailed information and engineering drawings for each awning to support the permit application.  Upon information and belief, his request was simply a pretext to harass and burden Sign Pro.  Among other things, this type of information is not requested from Sign Pro's competitors that are allowed to operate with impunity despite ignoring applicable rules and regulations.

107.   Plaintiffs requested that the Town of Southington provide an example of another permit applicant who was asked to submit engineered drawings.  The Town of Southington had no response.

108.   Sign Pro absorbed and did not pass on to its client approximately $8,000 in additional costs related to preparing engineered drawings for the awnings.

109.   Pooler also had numerous direct conversations with Sign Pro's client about the permits in an attempt to damage Sign Pro's reputation.

110.   Sign Pro installed twice the amount of anchors required for the awnings at 685 Queen Street.  Yet Pooler refused to approve the installed awnings during his inspection, claiming that 7 of the 400 wall anchors were not fully compressed.  Sign Pro had not fully compressed these handful of anchors to avoid damage to the building.  Upon information and belief, Pooler's claimed reasons for failing the inspection were a pretext.

**D. Defendants' Harassment and Targeting of Sign Pro Continued After Plaintiffs Filed Suit**

111. Not even the filing of this lawsuit in April 2023 and the media attention it received deterred Defendants from continuing to target and harass Plaintiffs.[1] Indeed, the filing of this lawsuit has only emboldened Defendants and pushed them to find new ways to interfere with Sign Pro's business.

112. For example, Sign Pro applied for a zoning permit to install a 12' x 9' x 2' monument sign at 36 Queen Street in late April 2023. The zoning permit was promptly reviewed and approved within just 3 business days.

113. But when Sign Pro applied for a building permit for this same project, Pooler engaged in pretextual and obstructionist conduct that caused numerous delays. Sign Pro applied for the building permit on April 26, 2023 and would not receive approval until July 17, 2023.

114. On May 4, 2023, Pooler requested "engineered stamped plans with foundation details for the proposed pylon sign." After repeated inquiries by Sign Pro asking for some explanation or basis for this request, Pooler claimed that engineer-stamped plans were required based on Section 107.1 of the 2021 International Building Code because there were "special conditions." Section 107.1 provides that "[w]here special conditions exist, the building official is authorized to require additional construction documents to be prepared by a registered design profession."

---

[1] *E.g.*, Ed Stannard, *CT Company Suing Hometown, Claiming Harassment Hurting Business*, Harford Courtant (Sept. 28, 2023); Michelle Tuccitto Sullo, *Sign Pro Sues Southington, Claiming Harassment*, Hartford Business Journal (June 19, 2023); Luther Turmelle, *Southington Business Sues Town Claiming Harassment*, CT Insider (June 26, 2023); Jesse Buchanan, *Southington's Sign Pro Suing Town in Federal Court Claiming Unequal Treatment*, Record-Journal (June 27, 2023).

115. Similarly, Pooler demanded that Sign Pro submitted a geotechnical report for 36 Queen Street without explaining the basis for this request or the minimum sign dimensions that would require the submission of a geotechnical report.

116. Besides the general and unverifiable claim that the size of the proposed sign supports a finding of "special conditions," Pooler never explained the basis for his demand that Sign Pro incur the costs of having engineer-stamped drawings and a geotechnical report prepared and submitted.

117. On several occasions, Sign Pro asked Pooler to explain what special conditions existed in this case and what minimum size dimensions would trigger such special conditions. Pooler simply ignored these requests, forcing Sign Pro to either accede to his unreasonable dictates or give up on the project.

118. To make matters worse, Sign Pro identified dozens of examples of sign permit applications that Southington approved *without* requiring the submission of engineer-stamped drawings or a geotechnical report, including prior Sign Pro applications that had been reviewed by officials besides Pooler.

119. Upon information and belief, Pooler's request for engineer-stamped drawings and a geotechnical report was pretextual and, indeed, retaliation for Sign Pro having filed this lawsuit and bringing his misconduct to light. His request caused numerous delays and added costs for Sign Pro in connection with this permit application.

120. Pooler resigned from the Building Department in January 2025. However, Sign Pro continues to receive unfair and inequitable treatment with respect to its permit applications. All the while, Sign Pro continues to see other permit applicants receiving expedited consideration

and preferential treatment, as well as the installation of signs without permits or licenses without any enforcement response from the Town.

### E. Sciota, Triano, Ricciardone, and Chaplinsky Fail to Act After Being Repeatedly Advised of the Town's Targeting of Sign Pro

121. Sciota served as the Town Manager until June 2024. The Town Manager is the Chief Executive of the Town of Southington and oversees the Building Department.

122. While he was the Town Manager, Sciota was involved in reviewing and responding to Sign Pro's repeated complaints regarding unlicensed sign installers who were allowed to operate in the Town of Southington with impunity, as well Sign Pro's repeated complaints regarding Pooler.

123. Moreover, Sciota was for some time directly and personally responsible for supervising Pooler. Pursuant to the organizational chart for the Town of Southing, the Chief Building Official typically reports to the Director of Planning and Community Development, also known as the Town Planner.

124. The position of Town Planner, however, is presently vacant, with David Lavalle serving as the Acting Director of Planning and Community Development on an interim basis. Representatives of the Town of Southington advised Plaintiffs that, in the absence of a Town Planner, Pooler reported directly to and was supervised by Sciota, at least until Sciota's retirement in June 2024.

125. Alex Ricciardone assumed the position of Town Manager in May 2024. Prior to that, he was the Town Attorney.

126. As Town Manager and before that as Town Attorney, Ricciardone was likewise involved in reviewing and responding to Sign Pro's repeated complaints regarding unlicensed sign

installers, Sign Pro's repeated complaints regarding Pooler, and Sign Pro's issues with building permits that Pooler handled.

127.    Triano served as the Chairwoman of the Town Council until November 2023.  The Town Council is the governing body of the Town of Southington and is generally empowered to exercise and perform all the rights, powers, duties, and obligations of the Town of Southington.

128.    On numerous occasions, Plaintiffs notified Triano (as well as Sciota, Ricciardone, Chaplinsky) that Pooler and others within the Town of Southington have subjected Sign Pro to a campaign of targeted harassment. Plaintiffs also notified Triano regarding the substantial volume of unlicensed contractors that were installing signs in Southington.

129.    Triano privately admitted to Rappoccio that Pooler is "no good" and "has to go." But despite these statements and assurances, Pooler remains in his position until January 2025 and the targeting and harassment of Sign Pro continues to this day.

130.    Chaplinsky assumed the position of Chairman of the Town Council in November 2023, having served on the Town Council since November 2021.

131.    As noted, Plaintiffs informed Chaplinsky of the unfair and inequitable conduct of Pooler and others within the Town of Southington directed to Sign Pro. For example, in April 2024, Mr. Rappoccio submitted a formal complaint to Chaplinsky regarding Sciota's handling of a dispute between Sign Pro and Pooler over a property inspection. The complaint was improperly dismissed and closed.

132.    Despite actual and constructive knowledge that Pooler and others have singled out Sign Pro for unfair treatment, Sciota, Ricciardone, Triano, and Chaplinsky failed to act or, for that matter, take any steps necessary to stop this ongoing harassment from occurring.

133.    In supervising Pooler and failing to remedy the targeting and harassment of Plaintiffs, Sciota, Ricciardone, Triano, and Chaplinsky acted with gross negligence amounting to deliberate indifference towards the constitutional rights of Plaintiffs.

**First Count:**           **Violation of Substantive Due Process Against All Defendants**

1-133. Plaintiffs incorporates by reference the allegations in paragraphs 1 through 133 above as if fully set forth herein.

134.    The Fifth Amendment to the United States Constitution provides that "[n]o person shall … be deprived of life, liberty or property, without due process of law."

135.    42 U.S.C. §  1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

136.    Through their actions, Defendants violated Plaintiffs' constitutional right to substantive due process, causing Plaintiffs to incur damages, including economic damages and emotional distress damages related to the anxiety and stress caused by Defendants' conduct.

137.    Plaintiffs have a valid property interest in permits issued for the projects with which Defendants interfered, including the permits for 161 Canal Street, 1 North Main Street, 685 Queen Street, 1 Center Street, and 36 Queen Street.

138.    Defendants infringed on Plaintiffs' property interests in an arbitrary and irrational manner intended to oppress Plaintiffs.

139.    Pooler and the Town of Southington relied on pretextual justifications to delay or deny Sign Pro's permits.

140.    Pooler and the Town of Southington engaged in a pattern of harassment that was systematic, intentional, and designed to damage Plaintiff's business, reputation, and standing in the community.

141.    Pooler's unconstitutional actions implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the Town of Southington.

142.    Pooler's edicts and acts as Chief Building Official may fairly be said to represent official policy for the Town of Southington.  Pooler is a final policymaker with respect to the conduct challenged in this lawsuit.

**Second Count:**        **Violation of Equal Protection Against All Defendants**

1-142.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 142 of the First Count as if fully set forth herein.

143.    The Fourteenth Amendment to the United States Constitution provides that no State "shall … deny to any person within its jurisdiction the equal protection of the laws."

144.    Through their actions, Defendants violated Plaintiffs' constitutional right to equal protection of the laws, causing Plaintiff to incur damages, including economic damages and emotional distress damages related to the anxiety and stress caused by Defendants' conduct.

145.    Compared with other businesses that were similarly situated, Plaintiffs were selectively and unfairly treated by Defendants.

146.    The selective and unfair treatment of Plaintiffs was based on a malicious and bad faith intent to damage Plaintiffs' business, reputation, and standing in the community.

147.    Defendants' unconstitutional actions implemented or executed a policy statement, ordinance, regulation or decision officially adopted and promulgated by the Town of Southington.

148.    Moreover, Pooler's edicts and acts as Chief Building Official may fairly be said to represent official policy for the Town of Southington.  Pooler is a final policymaker with respect to the conduct challenged in this lawsuit

**<u>Third Count:</u>          Municipal Estoppel Against Defendant the Town of Southington**

1-148.  Plaintiff incorporates by reference the allegations in paragraphs 1 through 148 of the Second Count as if fully set forth herein.

149.    Defendants and their authorized agents made statements and approvals calculated or intended to induce Plaintiffs to believe that an automatic sprinkler system was not required for 161 Canal Street.

150.    Plaintiffs exercised due diligence to ascertain the truth and, to the extent a sprinkler system was required, lacked knowledge of the true state of things and had no convenient means of acquiring knowledge.

151.    Plaintiffs changed their position in reliance on the statements and approvals made by Defendants and their authorized agents and proceeded with construction of 161 Canal Street without an automatic sprinkler system.

152.    Plaintiffs suffered damages as a result of the Town of Southington negating the acts of its agents and insisting at the last minute that Plaintiffs install an automatic sprinkler system at 161 Canal Street.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek the following relief:

(a)    Monetary damages in an amount to be proven at trial;

(b)    Pre-judgment and post-judgment interest;

(c)    Attorneys' fees and costs; and

(d)    Such other further relief as the Court shall deem equitable and just equitable.

**JURY DEMAND**

Plaintiffs request a jury for all triable issues.

> PLAINTIFFS SIGN PRO, INC., PRO
> REALTY LLC, and PETER RAPPOCCIO
>
>
> By:  */s/ Glenn W. Dowd*
>     Glenn W. Dowd (ct12847)
>     Matthew J. Letten (ct31121)
>     Day Pitney LLP
>     225 Asylum Street
>     Hartford, CT 06103-1212
>     Tel:  (860) 275-0100
>     Fax: (860) 275-0343
>     gwdowd@daypitney.com
>     mletten@daypitney.com